IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:17-CR-164-FL-1

UNITED STATES OF AMERICA,              )
                                       )
                                       )
    v.                                 )
                                       )            ORDER
                                       )
FRANCIS MAURICE THOMPSON,              )
                                       )
    Defendant.                         )

This matter is before the court on defendant's motion to suppress certain evidence allegedly

obtained in violation of the Fourth Amendment to the United States Constitution.  (DE 26).

Pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Criminal Procedure 59(b), United States

Magistrate Judge James E. Gates entered memorandum and recommendation ("M&R"), wherein it

is recommended that defendant's motion be denied.  (DE 42).  Defendant timely objected to the

M&R and the government has responded.  In this posture, the motion is ripe for ruling.  For the

reasons given more specifically below, the court denies defendant's motion.

## STATEMENT OF THE CASE

On December 8, 2017, defendant was named in a one count criminal complaint charging him

with, having been convicted of a crime punishable by imprisonment for a term exceeding one year,

knowingly possessing, in and affecting commerce, a firearm, in violation of 18 U.S.C. § 922(g)(1)

and § 924.  On December 20, 2017, defendant was indicted for the same offense.

On March 5, 2018, defendant filed the instant motion to suppress.  Defendant argues that he

was unlawfully seized by the police in violation of the Fourth Amendment.  Specifically, according

to defendant the police prevented him from driving his car away by blocking him in to his parking space and ordering him to put his hands up, ordered him out of his car without reasonable suspicion, and illegally searched his car. Defendant further contends that the gun retrieved from under the seat of his car by the police should be suppressed because his seizure was unlawful, led to the discovery of the gun, and therefore the gun is "fruit of the poisonous tree." In support of his motion, defendant offers several exhibits for the court's consideration, including various satellite maps and images illustrating the scene where events relevant to the instant motion took place (Ex. D1, D2, D3, D4), the Wilmington Police Department Policy on Body-Cams (Ex. D5), video of body-cam footage of events pertinent to the instant motion ("Video") (Ex. D6),[1] and a chain of custody form (Ex. D7).

The government argues in response that the police did not initially seize the defendant because they did not block his car from driving away, and they initiated their encounter with defendant as community caretakers trying to verify defendant was not overdosed on drugs. By the time the officers did seize defendant, the encounter became a Terry stop based on reasonable suspicion when defendant saw the police and started reaching in to the floor of the driver's seat. Upon removing defendant from the car, the police smelled marijuana, giving them probable cause to search the vehicle and find the gun hidden under the driver's seat.[2] In opposition to the motion, the government presented the testimony of the law enforcement officers effecting the seizure of defendant and the search of defendant's car, Officers Timothy Moon ("Moon") and Kaitlyn McHugh ("McHugh"). Additionally, the government presents two exhibits: photos of the firearm seized from

---

[1]All citations herein to the Video are to the time stamp in minutes and seconds (e.g., "00:00") appearing in the player on which the court viewed the Video, VLC Media Player. The time stamp embedded in the Video is in hours and minutes and is not precise enough to draw attention to relevant portions of the Video.

[2]Defendant does not dispute the finding of the magistrate judge that the police smelled marijuana coming from defendant's car. Therefore, the court does not specifically address this fact in the court's discussion below.

defendant's vehicle (Ex. G1), and excerpts of grand jury testimony of Dominique Eason ("Eason") (Ex. G2).

Evidentiary hearing was held before the magistrate judge on April 25, 2018.  M&R was entered July 11, 2018.  Therein, the magistrate judge recommends denying defendant's motion to suppress because defendant was not seized by the police until they had reasonable suspicion to detain him for investigation, at which point the search was not unreasonable under the Fourth Amendment.  Defendant's objections followed.

## STATEMENT OF FACTS

Upon de novo review of the evidence, the court adopts the factual findings of the M&R.  The court summarizes herein the facts most pertinent to addressing the objections to the M&R raised by defendant.

At the time of the events described, Moon was an officer with the Wilmington Police Department ("WPD") (Tr. 15:24-16:1), and McHugh was a deputy with the New Hanover County Sheriffs Office ("NHCSO") (Tr. 111:12-14).  Both Moon and McHugh were members of the Mobile Task Force, which is a joint task force between the WPD and the NHCSO.  (Tr. 16:14-16, 112:1-3).

At approximately 11:30 p.m. on August 31, 2017, Moon and McHugh were in the same marked patrol car conducting a roving patrol in the area of Cyprus Grove, driving around the area in order to be seen with the purpose of reducing crime and to see what type of activity is occurring.  (Tr. 17:7-16, 17:22-18:1, 18:19-20, 60:4-5, 113:11-19, 115:20-22).  Both Moon and McHugh were in uniform. (Tr. 18:21-22).  Cyprus Grove was known to both Moon and McHugh to be a high crime area because WPD and NHCSO had frequently investigated the area for gang and drug activity.  (Tr. 18:5-16, 37:25-38:4, 113:19-114:1, 114:6-9).

While traveling through the complex, Moon and McHugh came upon a gold Chevrolet Malibu backed into a parking space in front of Building Five of the complex. (Tr. 20:4-24). Moon believed he saw two people inside the Malibu and shined either his flashlight or the spotlight affixed to the patrol car into the interior of the Malibu. (Tr. 20:24-21:1, 115:11-16). Moon and McHugh saw two occupants through the windshield. (Tr. 21:8-10, 52:22-53:6, 129:10-20, 115:16-18). A black male with dreadlocks, [3] later identified as defendant (Tr. 22:14-23:3), was in the driver's seat, and a black female, later identified as Eason (Tr. 22:14-15, 25:23-26:1), was in the passenger's seat. (Tr. 21:11-15). Both occupants were slumped over, leaning against his and her respective window, and appeared to be unconscious. (Tr. 21:15-20, 53:22-25, 115:16-18). Moon and McHugh both testified that at the time they were aware of the heroin epidemic in Wilmington and the associated risk of overdoses. (Tr. 21:22-25, 116:8-12). Concerned that there may be a medical emergency, Moon parked the patrol car, but did not activate his blue lights (Tr. 21:22-25, 63:8-9).

Moon testified that he parked the patrol car with sufficient room for defendant's vehicle to drive away because Moon did not want the patrol car to be rammed if defendant tried to leave. (Tr. 55:11-21, 56:5-9). McHugh also noted that it took several steps to reach the Malibu, which she considered close enough to render aid but far enough away that she and Moon were safe. (Tr. 117:7-21). Moon said that at one point during the series of events in question he walked the distance between his patrol car and the Malibu in fewer than ten but more than five seconds, taking fewer than five paces. (Tr. 95:15-19, 96:9-11, 100:3-12, 108:23-109:1).

The Video shows that the Malibu was backed into a parking space and that the patrol car

---

[3]Moon testified that initially he thought defendant was another individual who was a validated gang member, Johnathan White ("White"). (Tr. 51:15-52:5, 54:23-55:2). Moon was not investigating White at the time he approached defendant's car. (Tr. 52:12-13). McHugh testified whether it was White in the car or another individual, the way they conducted themselves would not have changed. (Tr. 121:6-9).

was parked in front of and perpendicular to the Malibu, with the driver's side door of the patrol car facing the hood of the Malibu, but parallel to the curb opposite from where the Malibu was parked. (Video 03:15-19, 06:11, 06:20, 08:07-13, 09:57, 13:38-14:24, 14:34-45, 14:55, 15:27-31, 15:38, 17:01 , 17:58-18:05, 19:28-30, 20:25-45). The satellite map images of the complex and the Video demonstrate that in front of where the Malibu was parked there were two lanes of travel through the complex, and the patrol car was parked in the lane of travel farthest away from the Malibu. (Id.; Def.' s Ex. 3). The Video also shows that there was sufficient room for the Malibu to pull out of its parking space and leave without hitting the patrol car. (Video 03:15-19, 06:11, 06:20, 08:07-13, 09:57, 13:38-14:24, 14:34-45, 14:55, 15:27-31, 15:38, 17:01, 17:58-18:05, 19:28-30, 20:25-45. The Video also indicates there was sufficient room for other patrol cars to drive between the Malibu and Moon's patrol car. (Video 04:49, 06:48-56).

A map provided by defendant and marked by Officer Moon during the hearing shows two roads intersecting to the immediate right of the defendant's car. (Ex. D3). Both roads have two lanes for traffic. (Ex. D3).

Moon and McHugh exited their patrol car and walked toward the Malibu. (Tr. 22:11-12, 116:5-12). When Moon and McHugh approached the Malibu, it was not running, and Moon testified that he believed the windows were closed. (Tr. 55:7-10, 57:1-6). Moon approached the driver's side, and McHugh approached the passenger's side. (Tr. 116:24-117:3). As Moon and McHugh were walking toward the Malibu, both occupants appeared to wake up. (Tr. 22:14-18).

Eason immediately exited the vehicle to speak with McHugh, and McHugh could smell a strong odor of marijuana. (Tr. 117:3-6, 118:23-119:8). In her grand jury testimony, Eason testifies that she was not paying attention to anything that defendant did because she was focused on the

5

officers and seeing if her neighbors would come outside. (Ex. G2 at 10:20-12:9). Eason then observed the officers with defendant from the rear of the vehicle until she was detained by Moon. (Tr. 31:11-16).

As defendant awoke and saw the officers, he immediately reached toward the floorboard of the Malibu near his feet. (Tr. 22:14-18, 25:3-4, 66:3-4). Moon could not see defendant's hands, but heard metal hitting metal. (Tr. 25:5-6, 66:4-5). Moon testified that, because of defendant's actions, he thought defendant had a firearm. (Tr. 25:1-12). Moon forcefully commanded defendant to show his hands and not reach for anything. (Tr. 25:14; Video 00:01-10). Defendant did not comply, and continued reaching toward the floorboard. (Tr. 25:13-16). After ordering defendant multiple times to show his hands and telling him to not reach for anything, Moon opened the driver's side door to see what defendant was doing with his hands. (Tr. 26:21-27:3, 107:14-19). Moon's flashlight and the interior light of the Malibu illuminated the inside of the car. (Tr. 60:3-14). Moon testified that he was concerned that defendant had a firearm and was going to hurt someone. (Tr. 27:5-6). With the door open, Moon stated he could smell marijuana and see a bag of marijuana in the driver's door handle and a bag of it on the floorboard. (Tr. 27:14-28:3).

Several seconds after Eason exited the Malibu, McHugh realized Moon was struggling with the driver. (Tr. 119:10-13, 119:20-21). McHugh looked in through the passenger side door and saw defendant bent over at the waist with his right hand underneath the seat. (Tr. 119:21-23, 121:10-16). Moon was commanding defendant to show his hands. (Tr. 119:24-25; Video 00:01-10). McHugh testified that she was concerned about Moon's safety because she did not know what was under the driver's seat, and she could hear metal hitting metal. (Tr. 120:1-16, 123:9-15). Defendant's right hand was underneath his seat moving back and forth as if he was trying either to hide something or

pull something out. (Tr. 122:7-12). McHugh drew her firearm, pointed it at defendant, and commanded him to show his hands. (Tr. 121:15-17). At no point did defendant comply and show his hands. (Tr. 122:3-6).

Moon resorted to physically removing defendant from the vehicle, and as he was being removed, defendant continued to reach toward the floorboard. (Tr. 28:6-10). It took Moon, McHugh and other officers who arrived on the scene to remove defendant safely from the car. (Tr. 29:2-4). Because defendant continued to reach for the interior of the car even after being removed, Moon continued to tell defendant to stop reaching (Tr. 28:10-11) and had to pin defendant against the rear driver's side quarter panel to handcuff him (Tr. 30:24-31:12). Moon testified that he did not believe he pulled his gun out at any time during the encounter, but if he did, it would have been when he was pulling defendant out of the car. (Tr. 59:24-60:2).

At one point, defendant indicated he was trying to put his shoes on. (Tr. 28:10-12, 125:17-20; Video 00:02-16). However, while one of defendant's shoes was on the floorboard, it was located near the gas petal, and defendant was reaching under the driver's seat, where no shoe was located. (Tr. 28:14-23, 61:19-24, 125:21-23). While handcuffed outside of the Malibu, defendant reached for his waistband at the back of his pants and continued to reach back toward the interior of the Malibu. (Tr. 30:1-6, 107:20-108:1; 124:3-4). Moon testified that he was concerned that defendant was reaching for a weapon or trying to hide something. (Tr. 30:14-19). McHugh testified that she searched him a couple of times because she was not sure what he was reaching for. (Tr. 124:2-8). He also tried to pull away and run from the officers. (Tr. 30:8-9). As the officers grabbed him, he told Eason to close and lock the doors of the Malibu. (Tr. 31:3-6, 124:14-17). Defendant had to be placed on the ground to calm him down. (Tr. 32:1-2, 124:6-13).

When Moon walked back to the Malibu after detaining defendant and Eason, he investigated both the marijuana he had smelled and the item for which defendant was reaching. (Tr. 31:17-22). He saw a black firearm, a Taurus 9 millimeter (Tr. 34:12-14) halfway underneath the driver's seat directly below the metal seat adjuster. (Tr. 32:2-11). Moon testified that he believed the sound he heard of metal hitting metal was the sound of the firearm hitting the metal seat adjuster. (Tr. 32:11-13). The firearm and marijuana on the Malibu's floorboard were seized and turned in to the WPD. (Tr. 32:14-18, 69:23-70:2; Ex. D7). When Moon later found out defendant was a felon, defendant was subsequently charged with the offense for which he is presently indicted. (Tr. 37:1-10).

Additional facts pertinent to the motion will be discussed herein.

## COURT'S DISCUSSION

A.    Standard of Review

The district court reviews <u>de novo</u> those portions of a magistrate judge's M&R to which specific objections are filed. 28 U.S.C. § 636(b). The court does not perform a <u>de novo</u> review where a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." <u>Orpiano v. Johnson</u>, 687 F.2d 44, 47 (4th Cir. 1982). Absent a specific and timely filed objection, the court reviews only for "clear error," and need not give any explanation for adopting the M&R. <u>Diamond v. Colonial Life & Accident Ins. Co.</u>, 416 F.3d 310, 315 (4th Cir. 2005); <u>Camby v. Davis</u>, 718 F.2d 198, 200 (4th Cir. 1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

B.    Analysis

In his objections, defendant argues: (1) Moon and McHugh illegally seized defendant by blocking defendant's parked car with their patrol car, spotlighting him, and approaching him, and (2) Moon lacked reasonable suspicion to seize defendant. For the reasons stated below, the court rejects each of defendant's contentions.[4]

1.    Defendant's initial encounter with Moon and McHugh

The Supreme Court has identified three distinct types of police-citizen encounters, each requiring a different level of suspicion to be deemed reasonable under the Fourth Amendment: "(1) arrest, which must be supported by probable cause; (2) brief investigatory stops, which must be supported by reasonable articulable suspicion; and (3) brief encounters between police and citizens, which require no objective justification." United States v. Brown, 401 F.3d 588, 592 (4th Cir. 2005) (quoting United States v. Weaver, 282 F.3d 302, 309 (4th Cir.2002)).

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." Fla. v. Bostick, 501 U.S. 429, 434 (1991). Moreover, "[l]ocal police officers ... frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition

---

[4]Defendant does not object to the magistrate judge's finding that Moon and McHugh smelled marijuana once the car door was open, which would provide probable cause to search the passenger compartment of the vehicle for contraband. United States v. Carter, 300 F.3d 415, 422 (4th Cir. 2002). Because defendant does not object to the magistrate judge's finding, the court does not conduct a de novo review of the portion of the M&R pertaining to that finding. See 28 U.S.C. § 636(b)(1)(B).

of evidence relating to the violation of a criminal statute." Cady v. Dombrowski, 413 U.S. 433, 441 (1973); see Hunsberger v. Wood, 570 F.3d 546, 553 (4th Cir. 2009).

"A person is 'seized' within the meaning of the Fourth Amendment if, 'in view of all [of] the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" United States v. Black, 707 F.3d 531, 537 (4th Cir. 2013). Circumstances the court considers include, but are not limited to

> the number of police officers present during the encounter, whether they were in uniform or displayed their weapons, whether they touched the defendant, whether they attempted to block his departure or restrain his movement, whether the officers' questioning was non-threatening, and whether they treated the defendant as though they suspected him of 'illegal activity rather than treating the encounter as 'routine' in nature.'

United States v. Jones, 678 F.3d 293, 299–300 (4th Cir. 2012); see United States v. Stover, 808 F.3d 991, 997 (4th Cir. 2015). The court also considers "the time, place, and purpose" of the encounter. Santos v. Frederick Cty. Bd. of Comm'rs, 725 F.3d 451, 461 (4th Cir. 2013) (quoting Weaver, 282 F.3d at 310).

The initial encounter with defendant was not a seizure. A reasonable person would believe that they were able to leave because Moon and McHugh left defendant room to drive away. There was enough room for defendant to pull his car out of the parking space. The Video shows that there was enough space between the patrol car and defendant's vehicle for another car to pass through. (Video 04:49, 06:48-56; see also Tr. 108:16-22). The satellite map images of the complex and the Video also demonstrate that in front of where the Malibu was parked there were two lanes of travel through the complex, and the patrol car was parked in the lane of travel farthest away from the Malibu. (Video 03:15-19, 06:11, 06:20, 08:07-13, 09:57, 13:38-14:24, 14:34-45, 14:55, 15:27-31 , 15:38, 17:01 , 17:58-18:05, 19:28-30, 20:25-45); Ex. D3). Moon testified that he parked the patrol

car with sufficient room for defendant's vehicle to drive away because Moon did not want the patrol car to be rammed if defendant tried to leave. (Tr. 55:11-21, 56:5-9). Moon said that at one point during the series of events in question he walked the distance between his patrol car and the Malibu in fewer than ten but more than five seconds, taking fewer than five paces. (Tr. 95:15-19, 96:9-11, 100:3-12, 108:23-109:1). Together, these facts show a reasonable person would believe they could drive away.

Moreover, the other circumstances attending the initial encounter do not show that a reasonable person would feel unable to leave. Only two officers riding in one patrol car were initially present at the scene. (Tr. 18:1). Moon and McHugh were uniformed. (Tr. 18:21-22). Neither initially drew their weapons. (See Tr. 59:24-60:2, 121:15-17). Moon did not activate his blue lights. (Tr. 63:8-9). Up to this point, the officers were merely approaching the vehicle. (Tr. 22:11-12, 116:5-12). Neither had yet touched the defendant, restrained his movement, or had asked him any questions.

The officers were engaging in a caretaking function and treating the encounter as routine. Moon and McHugh saw defendant slumped over the in Malibu and thought he might be in need of medical assistance due to the frequency of drug overdoses in the area. (Tr. 21:15-20, 22-25, 53:22-25, 115:16-18, 116:8-12). The officers got out of their car in order to see if defendant was okay, and they illuminated the car with a light because it was dark.[5] (See Tr. 60:4-5, 115:20-22). At this point, a reasonable person would feel free to leave from this encounter. Therefore defendant was not seized until after he woke up, started reaching under his seat, and created a metal clanging sound hear by the officers. (Tr. 22:14-18, 25:3-6, 66:3-5).

---

[5]Before encountering defendant, Moon and McHugh had already checked on the occupants of another vehicle in a consensual encounter. (Tr. 18:25-20:3, 114:10-15, 19-115:5).

Defendant first argues that Officer Moon's testimony is not credible because 1) he placed an X on the exhibit where he believed he was parted on the map that was not where the patrol car was parked, 2) Moon suggested another officer moved the patrol car, and 3) Moon "admitted" that defendant's car could only go to the right. Defendant's attempt to impeach Moon's testimony is unpersuasive because the his suggestions are not enough to defeat the magistrate judge's reasoned finding that Moon's testimony was truthful. When Moon indicated where he thought his car was parked on defendant's exhibit, he stated to the court that his car was parked "in the general area, not the exact spot" marked on the map. (Tr. 109:5-16). Similarly, Moon's suggestion that another officer "could have moved [his] car" does not necessarily impeach Moon's testimony, since he later conceded that the car was his.[6] (Tr. 85:6-15, 108:16-22). Finally, Moon's statement that the car can still go right does not necessarily impeach his earlier statement that the car could go left to get around his car, and even if it did, defendant could still get out going around the officer's car to the right. (Tr. 55:11-21; 84:19-22; see Tr. 20:22-23, Ex. D3). Consequently, defendant's attempts to impeach Moon's credibility fail.

Next, defendant argues that Eason's grand jury testimony conflicts with the officer's testimony and must be credited. However, defendant overstates the value of the testimony. As a threshold matter, Eason's testimony is largely consistent with that of Moon and McHugh. When Eason was repeatedly asked if she saw anything that defendant was doing in the car, she responded essentially: "I wasn't paying attention to [defendant] because I was trying to see if my neighbors was going to come outside." (Ex. G2 at 10:20-12:6). Eason's testimony is also consistent with other

---

[6]The magistrate judge also considered Moon's statement that he was unsure the patrol car was his, and still reached the conclusion that the Moon's testimony was generally accurate because he later conceded that the patrol car was his. (M&R (DE 42) at 5 n.5).

testimony that suggests Moon and McHugh approached the vehicle and tapped on the window before commanding the individuals to put their hands up. (Ex. G2 at 10:14-19). Finally, Eason corroborates the finding that defendant's car smelled like marijuana. (Ex. G2 at 9:19-20, 10:1-4).

Where divergent from other testimony, the court finds Eason's grand jury testimony not credible for several reasons. Her account differs from Moon in McHugh's testimony in certain respects that are verifiably false. For example, Eason described McHugh approaching defendant's window, where the Video shows that Moon was the one to approach defendant. (See Ex. G2 10:16-18; Video 0:00-10). Additionally, Eason's prior felony conviction in 2015 is probative of character for untruthfulness. (Ex. G2 at 3:22:4:11). Finally, despite being called before the grand jury as a government witness, Eason has a clear bias in this case because of her friendship with defendant. (Ex. G2 at 6:1-12, 7:8-17, 9:2-15). Consequently, the court find's Eason's testimony to be incredible where it conflicts with Moon and McHugh's testimony.

Apart from challenging the credibility of the evidence, defendant argues that 1) the only path the Malibu could travel was to the right, 2) the patrol car was only feet away from the bumper, and 3) defendant could not drive away because he would have hit Moon and McHugh. As the court explains above, the Malibu could travel to the right of the patrol car, which would give defendant the option of traveling down two possible roads, one of which was a dead end and the other of which would allow him to exit the property. (Ex. D3; see Tr. 20:22-23, 55:11-21). The patrol car was far enough away that another car was able to pass in between the patrol car and defendant's car, illustrating that an entire lane of traffic was open and available to defendant. (Video 04:49, 06:48-56; see also Tr. 55:11-21, 56:5-9, 95:15-19, 96:9-11, 100:3-12, 108:16-22, 108:23-109:1). Contrary to defendant's assertion, the evidence shows that defendant's case is distinguishable from

Stover, where the defendant had actually been blocked from leaving by the police. Stover, 808 F.3d at 997.

As to defendant's contention that Moon and McHugh approaching the vehicle barred defendant's path to leave, defendant offers no evidence to support his argument that he could not drive away as the officers approached. Moreover, the "mere possibility that [defendant] might be questioned" as he drove off is not sufficient to demonstrate "reasonable apprehension ... that [he] would be seized." INS v. Delgado, 466 U.S. 210, 217-19 (1984); see United States v. Drayton, 536 U.S. 194, 204-205 (2002).

The court overrules defendant's first objection to the M&R. Moon and McHugh were engaged in community caretaking at the beginning of their encounter with defendant. As discussed in the next section, their interaction became a Terry stop after defendant created reasonable suspicion that a crime had been committed.

2.     Reasonable Suspicion

"[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30 (1988)). Further, if an officer believes that the person is armed, he may pat the person down, or "frisk" him, for weapons. Terry, 392 U.S. at 30. In contrast to the circumstances here, which involved a parked car, during a traffic stop, due to the fact a suspect may return to the vehicle after or during the Terry investigation, an officer may conduct a search of the vehicle for weapons if he has "an articulable and objectively reasonable belief that the suspect is potentially dangerous." Michigan v. Long, 463 U.S. 1032, 1050-52 (1983).

"The reasonable suspicion standard is an objective one, so we examine the facts within the knowledge of [the officers] to determine the presence or nonexistence of reasonable suspicion." United States v. Powell, 666 F.3d 180, 186 (4th Cir. 2011). "The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior, and it is measured by the totality of the circumstances." Id. (internal quotation marks and citations omitted).

As noted above, Moon and McHugh approached defendant's car in a high-crime area known for drug and gang activity around 11:30 pm to determine if defendant and Eason were okay. (See Tr. 18:5-16, 21:15-20, 22-25, 37:25-38:4, 53:22-25, 60:4-5, 113:19-114:1, 114:6-9, 115:16-22, 116:8-12). As defendant awoke and saw the officers, he immediately reached toward the floorboard of the Malibu near his feet. (Tr. 22:14-18, 25:3-4, 66:3-4, 122:7-12). Both officers could not see defendant's hands, but heard metal hitting metal. (Tr. 25:5-6, 66:4-5, 120:1-16, 123:9-15). Carrying a concealed weapon without a permit is illegal in North Carolina. N.C. Gen. Stat. § 14-269. Together, these circumstances are sufficient to show reasonable suspicion that defendant possessed a firearm, and thus Moon was justified in seizing defendant by commanding he put his hands up to ensure Moon's and McHugh's safety. (See Tr. 27:5-6).

Defendant argues that the officers did not have reasonable suspicion because 1) Moon's testimony was not credible and Eason's grand jury testimony was credible, and 2) Moon did not react differently by telling McHugh "he may have a gun" or brandish his own firearm. For the reasons previously stated, the court reject's defendant's contentions as to the credibility of the evidence. With respect to defendant's second contention, the court observes that Moon did react in a way that would alert McHugh to the danger of a potential firearm – by commanding defendant

to put his hands up very forcefully. (Tr. 25:14; Video 00:01-10). McHugh assisted by drawing her own service weapon. (Tr. 121:15-17). Therefore, defendant fails to show any irregularity in how officers would be expected to behave when confronting someone who might have a firearm.

The court overrules defendant's second objection to the M&R, finding reasonable suspicion upon de novo review of the evidence.

## CONCLUSION

Based on the foregoing, upon <u>de novo</u> review of those portions of the M&R to which specific objections were raised, and considered review of the remainder thereof, the court DENIES defendant's motion to suppress. (DE 26). An order scheduling arraignment will follow.

SO ORDERED, this the 9th day of October, 2018.

LOUISE W. FLANAGAN
United States District Judge